Finley PATTERSON

v.

BESSEMER COAL, IRON & LAND COMPANY.

Civ. A. No. 4132.

United States District Court
E. D. Tennessee, N. D.

Jan. 26, 1961.

O'Neil, Jarvis, Parker & Williamson, Knoxville, Tenn., for plaintiff.

Clyde W. Key, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is a suit by Mr. Finley Patterson against the Bessemer Coal, Iron & Land Company, to recover benefits under the Workmen's Compensation Law for alleged injuries sustained by him which he claims arose out of and in the course of his employment in June or July, 1958.

It is the theory of plaintiff that he was working as a motor operator for the defendant near Oliver Springs, Tennessee, and that on the date indicated the motor which he operated and another motor operated by a fellow employee collided, plaintiff's motor being struck from the rear, and that he was injured by reason of this collision. (A motor is a unit used in coal mines to pull cars used for hauling coal from the mine.)

There is no question but what he was earning a weekly wage of around $100.00 at the time of the accident, and if entitled to recover permanent and total benefits he is entitled to recover the maximum amount provided by the Tennessee Workmen's Compensation Law.

Under the theory of the defendant it is denied that plaintiff sustained any injury by accident arising out of and in the course of his employment.

In this connection, defendant asserts that any disability with which plaintiff suffers, or has suffered, is the result of natural causes and not of any accidental injury arising out of or in the course of his employment.

As affirmative defenses, defendant asserts that plaintiff did not give written or oral notice of his accident within 30 days after it occurred, and by reason of this fact he is not entitled to recover; that the defendant did not have any actual knowledge of the alleged accidental

injury, and that the first and only notice which it had of any claim on the part of the plaintiff by reason of an accidental injury was the filing of the suit.

The defendant relies on plaintiff's failure to give written notice of the accident as a bar to the suit, and by an amendment to the pre-trial order defendant affirmatively pleads the one-year statute of limitations as a bar to the suit. This point was made in defendant's answer under paragraph 6.

The issues for the determination of the Court, as set forth in the pre-trial order of January 3, 1961, are as follows:

(1) Did plaintiff receive an injury by accident arising out of and in the course of his employment?

(2) If plaintiff did sustain such injury, did he give the defendant written notice thereof, or cause such notice to be given as required by the Tennessee Workmen's Compensation Law, or in the absence of such notice, did the defendant have actual knowledge of said accidental injury?

(3) If Issues 1 and 2 are answered in the affirmative, is plaintiff's cause of action barred by the statute of limitations of one year contained in Sections 50–1003 and 50–1007, T.C.A.?

(4) If issues 1 and 2 are answered in the affirmative, what is the duration of plaintiff's temporary disability and extent of his permanent disability, if any, resulting from said injury?

In order to properly pass on the issues, it is necessary to briefly examine the testimony in the record which was introduced in the trial of the case here today.

Plaintiff is 46 years of age and worked for more than 20 years for the defendant. He was making $100.00 per week at the time that his disability developed. He testified that he sustained an injury as a result of an accident in June or July, 1958, while working in the mine. It was sometime around his vacation time. He was a motor operator and worked inside of the mines. At the time of the accident he was inside of the mine spotting cars for the shuttle cars. The shuttle car un-loaded coal into his cars. At the time of the accident his motor was connected to the cars. The shuttle car was a 10-ton motor, while his motor was around 6 tons. The motor that hit him had attached to it a number of empty cars. Some person failed to throw the switch properly and the other motor came onto the side track where his motor was located and this caused the accident. The impact was a hard one. Plaintiff was knocked down and his neck was burned between the shoulders. He did not know his neck was broken. He continued to work. His neck got sore and stiff. It stayed sore to some extent for three or four weeks.

Roy Miles was his boss and he reported the accident to Miles at the end of the shift.

In 1954, he was examined by Dr. Van Hook at the instance of the defendant and was pronounced able to work. In January, 1959, his right leg was getting weak but he did not know that the trouble in his leg, and subsequently in his other leg and arms, had any relation to the neck injury caused by the accident. He went to Dr. Paul Spray of Oak Ridge in 1959, and Dr. Spray thought he had arthritis. He was not having much difficulty in his back or left leg at that time. His arm was weak.

In January of 1960, he was still working on the job. At that time Roy Miles told him that Mr. Haydon, defendant's superintendent, wanted a statement from him as to his physical difficulties; that he wanted him to go to a doctor for an examination; that he thereupon went to Dr. Robert Brashear in Knoxville, who X-rayed him between December 1 and 15, 1959, and Dr. Brashear stated, in substance, that he could not find anything wrong with his back or legs but wanted him to return January 18, 1960. Dr. Brashear called in Dr. Frank Turney, neurosurgeon of Knoxville, on the 18th, who put plaintiff in the hospital. On the 19th, Dr. Turney made X-rays of his neck and told plaintiff that the muscles in his neck had gone down, and this fact apparently was what prompted the taking of

the X-rays of the neck. The X-ray showed that his neck was broken. This was the first knowledge that plaintiff had that the accident had caused a broken neck. He did not suspect the hurting of his legs and arms as being connected with a neck injury; nor did Drs. Spray and Brashear discover that such disabilities were related to the neck trouble that resulted from the accident—nor did anyone know that such troubles were related to the neck injury until this was discovered by Dr. Turney. Dr. Turney would not give him a slip to return to work.

Subsequently, he went to Dr. William F. Gallivan, an orthopedic surgeon of Knoxville, for treatment.

Plaintiff's neck has been getting worse. He states that he is going down on the left side; he is weak. His neck is in traction. He now weighs about 116½ pounds, and before the accident he weighed about 138 pounds. He has trouble in his right arm and he hasn't much use of his legs. He cannot walk without crutches; cannot work. His legs were good except for a kneecap injury to his right knee about the time of World War II. He never had any trouble with his arms and neck before the accident.

Plaintiff lived about two miles from the mine where he worked. He rode to and from work with Don Hacker. On March 31, 1958, prior to the accident in the mine, while Hacker was driving his car down the mountain, the brakes went out of order and he ran into a ditch. Plaintiff was a passenger in the car with Hacker at the time, but there is no evidence that he sustained any injury in this accident.

At the time of the collision in the mine, plaintiff said it felt like he had a ball of fire behind his neck. The accident happened about noon, but he continued to work the remainder of the day. His neck hurt that night, and he went to Oliver Springs to see Dr. Van Hook but did not get to see him. Plaintiff continued to work every day until he was examined by Dr. Turney and was told he could not work any more. He began having pains in his right leg in January, 1959, and it

was getting weaker and continued to hurt, but he did not know that this leg trouble had any connection with his neck injury.

The foregoing is the substance of the testimony of Mr. Patterson.

Doctor Gallivan treated plaintiff first on August 22, 1960. He found that his second cervical vertebra was dislocated—having slipped forward. This is called subluxation. The vertebra is not completely out of place. This dislocation causes pressure on the spinal cord. Plaintiff has a congenital abnormality in cervical vertebrae 3 and 4. These vertebrae are fused together. This is below the subluxation allegedly caused from the accident.

The subluxation interferes with his spinal cord. It compresses the spinal cord. Dr. Gallivan advised an operation on the neck but does not know whether this will help the situation. He thinks that the accident caused the subluxation. In his opinion, plaintiff is 100 per cent disabled for performing manual labor. He states plaintiff can operate a motor or elevator. Plaintiff told him that the pain had lasted about one and one-half years. The subluxation has affected some of the nerves in plaintiff's body.

Doctor Gallivan thinks that if plaintiff had gone to a doctor that his condition would have been discovered and prospects for recovery would have been much better. He thinks that the subluxation could have been reduced before too much damage to the nerves. He thinks that if an operation is not performed that damage will continue to the nerves, and if it reaches a certain point plaintiff will become paralyzed in his lower extremities.

Plaintiff also was examined by Dr. John T. Robson of Harlan, Kentucky, who filed a written statement which by agreement was treated as evidence. This statement shows that Mr. Patterson was in the hospital in Harlan on December 14, 1960 and was discharged the following day. Dr. Robson stated that plaintiff advised him that he noted pain in his leg in January of 1959 and that it continued intermittently.

Roy Miles is now employed by the defendant and has worked there seven years. He stated that he was plaintiff's boss at the time of the accident; that plaintiff reported the accident to him; that he told him the next morning he was injured as a result of the accident; that he used language to the effect that the wreck came near breaking his neck. Miles reported the accident to Bill Pride, mine foreman, who was supposed to make out an accident report. Pride told Miles he would go see the motormen.

Don Hacker is also employed by the defendant. He described the accident, and stated that plaintiff said shortly after the accident that the collision came near breaking his neck. He testified that Roy Miles was supposed to be the boss of the motor operators. Hacker ran the shuttle car that was involved in the collision.

Roy Patterson testified that Miles was the boss and Bill Pride was Miles' boss. Pride asked Roy Patterson about the accident the following day. Nicky Patterson was running Roy Patterson's motor at the time the accident occurred. Roy Patterson gave a written statement to defendant's counsel to the effect that the accident was slight and that plaintiff did not know that he was hurt as a result of the accident.

Plaintiff Patterson has a fourth grade education. He was only capable of performing manual labor. Plaintiff stated that he called Mr. Haydon two weeks after he got out of the hospital but that Mr. Haydon would not pay him compensation.

Mr. Haydon has been superintendent of defendant's mine since 1948. He states that he first learned of the collision in the mine after the suit was filed, which was in September, 1960. He had a notice posted on the bulletin board at the mine to the effect that each employee injured should notify his foreman. In 1948 he noticed that Finley Patterson had a peculiar way of walking, and found that he had walked with a disjointed shuffling gait from the time he was a young boy. In the latter part of 1959, he noticed that plaintiff was walking in a different gait and instructed plaintiff to find out what was wrong. He does not remember that plaintiff reported to him what he found out from the doctor's examination. He states that Roy Miles is a dispatcher and not a foreman, and that the bosses are supposed to fill out the accident report.

Mr. Bill Pride was the foreman of the mine. He first learned of the injuries from the accident after the suit was filed, although he heard about the accident shortly after it happened. He made no record in his time book about the accident. Miles and plaintiff both told him about the two cars colliding. Miles was in charge of the motor operators. Mr. Pride told the motormen that they could take orders from Miles or go home. He did not hear the plaintiff's neck was broken until January or February, 1960.

Plaintiff uses crutches in order to walk. The Court's observation of him during the trial indicates that he is a bad cripple, and the Court shares the opinion of Dr. Gallivan that plaintiff will never again be able to do manual labor.

The Court has reviewed the testimony which has been introduced in the case in more detail than is done in the ordinary case. The reason for so doing is that the case is in many aspects unusual. In the ordinary case, a person sues to recover benefits for an accidental injury under the Workmen's Compensation Law, within a short time after liability is denied, where the employer, or its insurance carrier, refuses to pay.

Here we have an accident that occurred either in June or July, 1958 and suit was not instituted until September 15, 1960. The explanation for this long delay in the institution of suit is obvious to the Court. Neither plaintiff nor his bosses, nor anyone connected with the plaintiff or the company, had any idea that plaintiff had sustained any serious injuries as a result of those motor cars colliding either in June or July, 1958. Plaintiff, Hacker, Miles and Roy Patterson knew that the cars collided, but they did not know that plaintiff had sustained a broken neck as a result of the collision. Mr. Pride

knew shortly afterward that the cars collided as Miles told him that they had collided, but he did not know that plaintiff had sustained a broken neck as a result of the collision. Defendant had equal opportunity with plaintiff to find out if plaintiff sustained serious injuries as a result of the accident.

Plaintiff knew that his neck was hurt as a result of that collision, but he had no idea that it was broken or seriously injured. His broken neck did not prevent him from working because he worked most every day from the date of the accident in June or July, 1958 until he was examined by Doctor Turney on January 19, 1960. That was the first time that plaintiff knew that he sustained disability from the accident that prevented him from performing his duties as a motorman for the defendant.

Doctor Gallivan is of the opinion that plaintiff's broken neck was caused by the injury that he received in the 1958 accident. He qualified his opinion by stating that it was based upon the premise that plaintiff truthfully related to him the circumstances surrounding the 1958 accident. There is nothing in this record to show or to indicate that plaintiff misrepresented any of the facts surrounding the accident to Dr. Gallivan or to any other party.

■ The Court listened to plaintiff's testimony carefully and plaintiff impressed the Court as a truthful, sincere individual. The Court finds as a fact that plaintiff received the neck injury which has been the subject of testimony in this case while in the performance of his duties for the defendant and that it arose out of and in the course of his employment for the defendant.

■ The Court further finds that plaintiff did not give written notice of the accidental injury that he sustained, but that he gave notice to Roy Miles, and the preponderance of the proof shows that Roy Miles was his boss and that Miles gave notice to Mr. Pride, the foreman, and since the employer had actual notice of the accidental injury the failure of the plaintiff to give written notice does not bar his recovery.

The Court finds that the 30-day notice provision of the statute was complied with because the defendant had actual knowledge of the accidental injury at the time or immediately after it occurred.

■ The next issue is whether plaintiff's suit is barred by the one-year statute of limitations. The rule in Tennessee is that the statute of limitations begins to run when the disabling consequences become apparent to the injured party; that the statute does not begin to run until the employee discovers that the injury is a serious one and that it arose out of and in the course of his employment; that the statute does not begin to run until the injury becomes disabling—or to put it another way, that the statute does not begin to run until the disability is known by the injured party.

Plaintiff's injury did not become known to him, or did not disable him from engaging in work, until January 19, 1960. For discussion of the applicable rules see: Ogle v. Tennessee Eastman Corp., 185 Tenn. 527, 532, 206 S.W.2d 909; Burcham v. Carbide & Carbon Chemicals Co., 188 Tenn. 592, 602, 603, 221 S.W.2d 888; Griffitts v. Humphrey, 199 Tenn. 528, 288 S.W.2d 1; Pittman v. City Stores, Inc., Tenn., 325 S.W.2d 249; Netherland v. Mead Corp., 170 Tenn. 520, 98 S.W.2d 76; Travelers Ins. Co. v. Jackson, Tenn., 332 S.W.2d 674; Bradford v. Dixie Mercerizing Co., 199 Tenn. 170, 285 S.W.2d 136; Johnson v. United States Fidelity & Guaranty, D.C. E.D.Tenn.1954, 126 F.Supp. 84.

The Court finds that plaintiff's action is not barred by the one-year statute of limitations.

This brings us to the final issue, to wit: If issues 1 and 2 are answered in the affirmative, what is the duration of plaintiff's temporary disability and extent of his permanent disability, if any, resulting from said injury?

The Court finds that plaintiff became permanently and totally disabled on Jan-

uary 19, 1960, the date that Doctor Turney advised him of his broken neck and refused to give him a permit to return to work.

The Court further finds that plaintiff is permanently and totally disabled as a result of his accidental injury that occurred either in June or July, 1958.

Present order in conformity with this memorandum.